OPINION OF THE COURT
Sheldon S. Levy, J.
This case raises the cup of decision on the novel proposition whether an incorporated not-for-profit social club can charge nightly dues to its members and distribute free liquor without a license to sell alcoholic beverages.
Surprisingly, this appears to be the first reported case on this precise subject — apparently because the present not-for-profit corporate social club approach is comparatively new and the enforcement agencies have not previously had an opportunity to challenge it.
In this proceeding, commenced by petitioner New York State Liquor Authority pursuant to section 123 of the Alcoholic Beverage Control Law, a permanent injunction, inter alia, to prevent the sale of alcoholic beverages without an appropriate license, is sought against respondents Sutton Social Club, Inc., also known as Top Floor Discotheque, and its president Thomas Maloney.
Simply stated, the operative facts are that it is alleged by petitioner that respondent social club exacts a nightly dues fee or admission charge from each of its so-called members and their guests (of from $6 to $10 per person) and then provides free alcoholic beverages, as well as dancing and backgammon, for all who wish to partake. The club is open only on Friday and Saturday nights from about 10:30 p.m. until at least 4:00 a.m. and occasionally 8:00 a.m., the following morning.
Upon the nonjury trial and hearing of the petition herein, pursuant to section 123 of the Alcoholic Beverage Control Law, two investigators for petitioner authority testified that they were admitted to the premises on May 14, 1977, without joining the club or even displaying membership cards, upon the presentation of their driver’s license and the payment of a per head admission charge of $10. Thereafter, each investigator was served two free drinks of an alcoholic beverage at either a horseshoe bar or a cocktail lounge on the premises during a 6:00 a.m. to 8:00 a.m. period. When a bartender was questioned by each about a charge for the drinks, he replied that they were included in the $10 admission fee.
*1026 Respondents, in fact, conceded that alcoholic beverages were being served. Moreover, the only witness called by respondents — the president of the corporate respondent — did not directly contradict any of the aforesaid proofs of petitioner. Instead, he merely pointed out that the club had between 500 and 550 members; that membership cards with photographs and signatures were issued to all members; that members must display membership cards at the door to gain admittance; that the usual admission charge or nightly dues fee was $8 for men and $6 for women; and that alcoholic beverages (and entertainment) are not sold, but are provided free as part of the nightly dues payment. The witness did not, however, recall if he was at the premises on the morning in question, and, in any event, he stated that he almost always left by 4:00 A.M.
The applicable statutes involved in the litigation are all sections and subdivisions of the Alcoholic Beverage Control Law of the State of New York.
Section 2 of the Alcoholic Beverage Control Law sets forth the policy of New York State with respect to alcoholic beverages and the purpose of the legislation. It reads in pertinent part: "It is hereby declared as the policy of the state that it is necessary to regulate and control the * * * sale * * * within the state of alcoholic beverages for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to law.”
Subdivision 1 of section 100 of that same law, as it pertains herein, states: "No person shall * * * sell at * * * retail any alcoholic beverage within the state without obtaining the appropriate license therefor required by this chapter.”
Finally, subdivision 28 of section 3 of the Alcoholic Beverage Control Law defines "sale” as "any transfer, exchange or barter in any manner or by any means whatsoever for a consideration, and includes and means all sales made by any person, whether principal, proprietor, agent, servant or employee of any alcoholic beverage”. (Emphasis supplied.)
It is the claimed violation by respondents of subdivision 1 of section 100 of the Alcoholic Beverage Control Law, for which petitioner authority seeks permanent injunctive relief, pursuant to section 123 of the Alcoholic Beverage Control Law. "If any person shall engage * * * in the * * * sale of liquor, wine or beer in this state without obtaining the appropriate license *1027 therefor * * * the liquor authority * * * may present a verified petition * * * for an order enjoining such person engaging or participating in such activity” (Alcoholic Beverage Control Law, § 123, subd 1). This the authority has done, and the instant proceeding is the culmination thereof.
Initially, it should be stated that I give full credence to the testimony of petitioner’s investigators. However, even upon respondents’ evidence — or lack thereof — it is perfectly plain that corporate respondent is engaging in the unauthorized and unlicensed sale of alcoholic beverages on its premises.
The fact alone that a nightly dues charge or admission fee is levied upon each member — and even upon their guests — is indicative of nightly expenditures and expenses which, obviously, primarily include the cost of liquor and other alcoholic beverages. "They are charged a fee which is actually a donation to the club to help cover the expenses”, respondent’s president testified. Certainly, the backgammon boards and disco records, when used by the club membership, do not constitute a major source of nightly expense. Whether the nightly fee is $10 per session, as testified to by petitioner’s agents, or $8 for men and $6 for women (plainly discriminatory), as stated by corporate respondent’s president, it is clearly discernible that a good portion of that door charge, no matter how labeled, perforce, goes towards the purchase of the alcoholic beverages that are provided free on the premises "for the asking”, but which, in reality, are being sold to those members who come to the club on any particular night. Nor can respondent’s weekend activities be equated to the occasional dinner-dance given by a legitimate political, religious, fraternal or charitable club, wherein drinks are incidental and constitute only a small portion of the total cost of the affair.
Within the definition of the term "sale”, as set forth in subdivision 28 of section 3 of the Alcoholic Beverage Control Law, and the meaning and prohibition of subdivision 1 of section 100 of that same law, corporate respondent is engaged in the sale of liquor on its premises as if money was being exchanged for liquor at the bar instead of for liquor and entertainment at the door. A "sale” by any other name would still smell from the alcoholic beverages involved. By any reasonable interpretation of the broad, but clear language of the statutory enactments herein, it must be held in law, logic and as a matter of practicality that alcoholic beverages are being sold to all who desire them for monetary consideration *1028 as a part of the price of admission to the club (see Alcoholic Beverage Control Law, § 160).
If any contrary interpretation were adopted — and if this obvious subterfuge were afforded legitimacy — there would be little need for alcoholic beverage licensing provisions of any type since such provisions and attendant controls could then readily be bypassed. This could be accomplished by the simple expedient of not-for-profit incorporation of a social club with nightly dues payments covering the cost of free liquor and other amenities. The next logical (or illogical) step — for any group to take to avoid the mandatory constrictions of legislative licensing — would be merely to charge $6 to $10 per night for the pretzels and potato chips and to give away all of the beer, wine and liquor desired (see New York State Liq. Auth. v Fuffy’s Pancake House, NYLJ, July 22, 1977, p 13, col 5).
This court, however, shall not permit the plain intent of sensible and purposeful legislative enactments to be subverted in any such fashion or the clear meanings of statutory definitions to be clouded with rhetoric or hyperbole.
As to the respondents’ arguments in opposition, all appear to be without merit. Even if we were dealing here with a legitimate not-for-profit "club”, as defined by subdivision 9 of section 3 of the Alcoholic Beverage Control Law, such a club is in no manner exempt from the plain provisions of section 100 of the Alcoholic Beverage Control Law. This section requires any person (which includes "an individual, copartnership, corporation, society or joint stock company” [Alcoholic Beverage Control Law, § 3, subd 22]) to obtain an appropriate license before selling any alcoholic beverage.
The only statutory exemption suggested by respondents is that contained in subdivision 7 of section 64-b of the Alcoholic Beverage Control Law, relating to bottle clubs, and which begins: "This section shall not apply to any non-profit religious, charitable, or fraternal organization nor to a club as defined in section three, subdivision nine of this chapter” (emphasis supplied). However, the parties have stipulated that no issue with respect to a bottle club is involved in the instant litigation and that no member brings his own bottle upon the club premises. Moreover, this specific exemption pertains only to the section itself (see People v Siff, 73 Misc 2d 414) and its usual requirement for obtaining a bottle club license and cannot serve to abrogate any other definitive licensing re *1029 quirements in other sections of the Alcoholic Beverage Control Law.
More specifically, respondent places firm reliance upon the phraseology contained in subdivision 1 of section 64-b of the Alcoholic Beverage Control Law which mentions that no person may come to a place of assembly to consume alcoholic beverages which "are either provided by the operator of the place of assembly, his agents, servants or employees, or are brought onto said premises by the person or persons assembling at such place” (respondent’s emphasis) without an appropriate license. Respondent contends that, since the operator may provide alcoholic beverages on the premises, the definition of "bottle club” is expanded thereby and that the exemption under subdivision 7 of section 64-b of the Alcoholic Beverage Control Law applies not only to bottle clubs, but also to those clubs in which alcoholic beverages are provided by the operator of the club.
However, subdivision 1 of section 64-b of the Alcoholic Beverage Control Law, was meant to restrict the ability of the operators of so-called "bottle clubs” to permit the consumption of alcoholic beverages on their premises and to deny such owners any right to give away alcoholic beverages. The rules of the State Liquor Authority state that "[n]o bottle club licensee shall purchase, sell or give away any alcoholic beverages on the licensed premises” (9 NYCRR 49.9[f]). In addition, section 49.9(g) of the same rules states that "[n]o bottle club licensee shall suffer or permit any alcoholic beverages to be brought into the licensed premises, or consumed therein, unless the container shall bear the signature of the person bringing such liquor into the premises or unless there is attached thereto a label signed by such person” (emphasis supplied).
It is quite clear, therefore, that the terminology of subdivision 7 of section 64-b of the Alcoholic Beverage Control Law was not meant to enlarge upon the definition of bottle clubs, nor to expand upon the scope and meaning of the entire section. Semantics may not be employed as a substitute for common sense and logic. Respondent cannot seek simultaneously the asserted benefits of the claimed exemption and avoidance of all of the liabilities, responsibilities, and prerequisites of all other sections of that law.
In addition, it is not a controlling factor that an unauthorized Seller of alcoholic beverages may not be making a profit *1030 on such sales. It is inconsequential what the price is of an individual drink or of a "round”, and whether the drink is paid for over the counter, at a cashier’s booth (with the use of a ticket stub) or at the door. It is the unlicensed sale of the liquor which is prohibited, not the profit or loss, and the amount for which the liquor is sold cannot justify an improper act. In this case, however, any ultimate profit is likewise proscribed if, in fact, the corporate respondent is a not-for-profit corporation.
Furthermore, the mere incorporation of a so-called "social club” as a not-for-profit corporation cannot afford respondent carte blanche to sell alcoholic beverages without a license. Nor can the simple, but necessary, expedient of obtaining a "Certificate of Occupancy” and a "Place of Assembly Permit” from the Department of Buildings of the Housing and Development Administration of the City of New York be the "open sesame” for a weekly fusillade of unlicensed liquor sales. In this regard, it should be noted that the alleged improper sales of alcoholic beverages took place between the hours of 6:00 a.m. and 8:00 a.m. Even if respondent corporation was licensed for on-premises consumption, such acts would be violative of the statute as "an after hours” sale (see Alcoholic Beverage Control Law, § 106, subd 5, cl [b]). Petitioner, however, pointedly states that it is the unauthorized sales, and not the times thereof, whether 6:00 a.m. or high noon, which rivet its concern.
Moreover, since any club member has the opportunity to secure a drink or more on any particular evening or morning, the fact that he may not choose to imbibe on that occasion does not alter the fact that liquor is being sold to other club members at that time and that all members are helping to support the practice whether they drink or not.
Finally, respondents assert that the evidence adduced by petitioner concerned only a few alleged sales on a single occasion and that, on other dates, other nonmembers were refused admission. The diligence by which respondent corporation protects its edifice and entrances on particular occasions cannot serve as condonation for or as mitigation of unauthorized and illegal activities. Such activities, by their very nature, would normally be closely guarded against prying and investigative eyes. There is no need to penalize the State Liquor Authority and the People of the State of New York in securing appropriate redress for committed wrongs merely *1031 because the perpetrators of such wrongs are vigilant in keeping out of their premises those who might expose their derelictions to public view. Even one such violation, if proven, as here to judicial satisfaction, would be sufficient to support requested injunctive relief. In addition, respondent’s own admission of providing free liquor to any and all of its members against nightly dues charges constitutes alone adequate proof of statutory violations.
All that has been said previously assumes that the corporate respondent was, in fact, a proper "club”, within the meaning of the statutory definition (Alcoholic Beverage Control Law, § 3, subd 9). However, the evidence produced before me in this case makes it plain that the Top Floor Discotheque is not. Since persons were admitted to the premises and to the bar and cocktail lounge upon the mere presentation of a driver’s license and without any membership card, it is a simple deduction that the guise and structure of club membership is employed solely as a subterfuge. In point of fact, it was having the price of admission (whether $6, $8 or $10) which determined eligibility for entrance, and it was this admission charge which covered the cost of the alcoholic beverages and other incidentals provided (see New York State Liq. Auth. v Plato’s Retreat, NYLJ, Feb 24, 1978, p 6, col 3).
If this does not constitute a "sale” within the meaning of the statute, then "happy days are here again.” By virtue of this determination, however, they are not here yet. Let full injunctive relief issue.
Accordingly, and for all of the reasons stated, the application, pursuant to section 123 of the Alcoholic Beverage Control Law, permanently to enjoin the unlicensed sale of liquor, wine and beer by respondents is, in all respects, granted.